# Exhibit A

# STATE OF NORTH CAROLINA

**WAKE** _____ County

| | |
|---|---|
| File No. | 09C\_\_18387 |
| Film No. | |

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| | |
|---|---|
| *Plaintiffs' Name*<br>**R. Daniel Brady, as Administrator for the separate Estates of Ali Kinani, et al.** | |

*Address*
c/o Lewis & Roberts, P.L.L.C.

*City, State, ZIP*
Raleigh, NC 27612

V E R S U S

*Defendants*
**XE Services LLC, et al.**

### Alias and Pluries Summons

The summons originally issued against you was returned not served.

| Date Last Summons Issued | * Disregard this section unless the block is checked |
|---|---|

| | |
|---|---|
| **TO:** *Name & Address of First Defendant*<br>Jeremy P. Ridgeway<br>1241 Shadowcrest Lane<br>Fallbrook, CA 92028 | **TO:** *Name & Address of Second Defendant* |

## A Civil action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

    1. Serve a copy of your written answer to the complaint upon the plaintiff or his attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy, or by mailing it, to the plaintiff at the plaintiff's last known address, and

    2. File an original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the Complaint, the plaintiff will apply to the court for the relief demanded in the Complaint.

| *Name and Address of Plaintiff's Attorney*<br>*If none, Address of Plaintiff*<br>James A. Roberts, III<br>LEWIS & ROBERTS, P.L.L.C.<br>3700 Glenwood Avenue, Suite 410<br>Raleigh, North Carolina 27612<br>(919) 981-0191 | *Date issued*<br>9-15-09<br><br>*Signature*<br>CHD | *Time issued*<br>4<br>☐ AM  ☒ PM |
|---|---|---|
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk of Superior Court | |

| ☐ ENDORSEMENT<br><br>This summons was originally issued on the date indicated above and was returned not served. At the request of the plaintiff, the time within which this summons must be served is extended thirty (30) days. | *Date of Endorsement*<br><br>*Signature* | *Time Issued*<br>☐ AM  ☐ PM |
|---|---|---|
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk of Superior Court | |

## RETURN OF SERVICE

I certify that this summons and a copy of the complaint were received and served as follows:

### Defendant 1

| Date Served | Name of Defendant |
|---|---|
|  |  |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name and address of person with whom copies left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

### Defendant 2

| Date Served | Name of Defendant |
|---|---|
|  |  |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name and address of person with whom copies left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Date Received | Name of Sheriff |
|---|---|---|
| By | Date of Return | County |
|  |  | Deputy Sheriff Making Return |

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
__CVS __

R. DANIEL BRADY, as Administrator for
the separate Estates of ALI KINANI,
ABRAHEM ABED AL MAFRAJE, and
MAHDE SAHAB NASER SHAMAKE; and
MOHAMMED HAFEDH ABDULRAZZAQ
KINANI, KALLED ABRAHEM AL
MAFRAJE, SAHAB NASER SHAMAKE,
MAJID SALMAN ABED AL-KAREEM,
NASEAR HAMZA LATIF RAHIEF,
GHASSAN ABAD ALKAREM
MAHMOOD, individually,

        Plaintiffs,

        v.

XE SERVICES LLC, BLACKWATER
SECURITY CONSULTING LLC, U.S.
TRAINING CENTER, INC., RAVEN
DEVELOPMENT GROUP LLC, GSD
MANUFACTURING LLC, PRINCE
GROUP, LLC, TOTAL INTELLIGENCE
SOLUTIONS LLC, GREYSTONE LIMITED
a/k/a GREYSTONE LTD, TERRORISM
RESEARCH CENTER, INCORPORATED,
TECHNICAL DEFENSE ASSOCIATES,
INCORPORATED, AVIATION
WORLDWIDE SERVICES, L.L.C.,
GUARDIAN FLIGHT SYSTEMS LLC,
PRESIDENTIAL AIRWAYS, INC., STI
AVIATION, INC., AIR QUEST, INC.,
SAMARUS CO LTD, ERIK PRINCE,
DONALD WAYNE BALL, DUSTIN L.
HEARD, EVAN SHAWN LIBERTY,
JEREMY P. RIDGEWAY, NICHOLAS
ABRAM SLATTEN and PAUL ALVIN
SLOUGH,

        Defendants.

**COMPLAINT**

**(Jury Trial Demanded)**

{00353295.DOC}

## NATURE OF THE ACTION

1.     This action arises from an unnecessary and unprovoked attack against innocent, unarmed Iraqi civilians on the early afternoon of September 16, 2007 at a traffic circle in Baghdad, Iraq known as Nisur Square. The wrongful conduct of defendants, as alleged herein, caused the needless deaths of at least fourteen (14) Iraqi civilians and serious injuries to a number of others, including women and children.

2.     This action is being brought against the corporate entities that previously operated in Iraq under the name "Blackwater" and are now known as "Xe" ("Blackwater-Xe"), as well as the individual defendants named herein, all current and former employees of Blackwater-Xe. Blackwater-Xe was established in or about 1996 and is one of the world's largest providers of private personal protective services. Blackwater-Xe began operating in Iraq in approximately August of 2003, pursuant to an independent contractor relationship with the U.S. State Department to provide private personal protective services to certain high-level U.S. and foreign officials working in Baghdad, Iraq.

3.     Blackwater-Xe created and fostered a culture of unlawful and reckless conduct amongst its employees, including the individual defendants named herein. The tragedy at Nisur Square on September 16, 2007 was only the latest incident in a pattern of egregious conduct by Blackwater-Xe personnel operating in Iraq.

4.     Defendants' wholesale slaughter of innocent civilians at Nisur Square was thoroughly investigated by United States military and criminal investigators, including the Federal Bureau of Investigation. As a result of the investigation into defendants' unlawful conduct at Nisur Square, the United States Department of Justice obtained criminal indictments against five of the individual defendants for their role in this unnecessary tragedy. Another

2

individual defendant, also a former employee of Blackwater-Xe, has entered a guilty plea for his role in the shootings at Nisur Square.

     5.    In this action, plaintiffs seek the recovery of compensatory damages for innocent civilians who were injured or killed at Nisur Square on September 16, 2007, as well as punitive damages for the conduct of defendants giving rise to the claims set forth herein.

## JURISDICTION AND VENUE

     6.    Subject matter jurisdiction over this cause is conferred upon and vested in this Court under and by virtue of N.C. Gen. Stat. § 7A-240 and § 7A-243.

     7.    Venue for this action is proper pursuant to N.C. Gen. Stat. §§ 1-79 and 82.

     8.    All conditions precedent to the filing of this action have been satisfied.

     9.    No federal causes of action or questions are raised herein.

## PARTIES

     10.    R. Daniel Brady (hereinafter "Mr. Brady"), a North Carolina licensed attorney and resident of Wake County, North Carolina, was duly appointed administrator of the Estate of Ali Kinani by the Clerk of the Superior Court of Wake County, North Carolina on September 9, 2009. Ali Kinani was a citizen and resident of Baghdad, Iraq and was nine years old at the time of his death on September 16, 2007. Mr. Brady is acting as administrator in the institution of this wrongful death action filed pursuant to N.C. Gen. Stat. § 28A-18-2. This action is filed within two years from the date of Ali Kinani's death.

     11.    Mr. Brady was duly appointed administrator of the Estate of Abrahem Abed Al Mafraje ("Abrahem Al Mafraje") by the Clerk of the Superior Court of Wake County, North Carolina on September 9, 2009. Abrahem Abed Al Mafraje was a citizen and resident of Baghdad, Iraq and was seventy-seven years old at the time of his death on September 16, 2007.

3

Mr. Brady is acting as administrator in the institution of this wrongful death action filed pursuant to N.C. Gen. Stat. § 28A-18-2. This action is filed within two years from the date of Abrahem Al Mafraje's death.

12. Mr. Brady was duly appointed administrator of the Estate of Mahde Sahad Naser Shamake ("Mahde Shamake") by the Clerk of the Superior Court of Wake County, North Carolina on September 9, 2009. Mahde Shamake was a citizen and resident of Baghdad, Iraq and was twenty-five years old at the time of his death on September 16, 2007. Mr. Brady is acting as administrator in the institution of this wrongful death action filed pursuant to N.C. Gen. Stat. § 28A-18-2. This action is filed within two years from the date of Mahde Shamake's death.

13. Ali Kinani, Abrahem Al Mafraje and Mahde Shamake are hereinafter referred to collectively as "Decedents."

14. Mohammed Hafedh Abdulrazzaq Kinani ("Mr. Kinani") is a foreign national and at all times alleged herein was a citizen and resident of Baghdad, Iraq. Mr. Kinani is the father of four children, including nine-year-old Ali Kinani, who was killed on September 16, 2007. Mr. Kinani brings this action under Iraqi law, alternatively in his individual capacity, as Ali Kinani's heir.

15. Kalled Abrahem Al Mafraje ("Mr. Al Mafraje") is a foreign national and at all times alleged herein was a citizen and resident of Baghdad, Iraq. He is the son of seventy-seven year-old Abrahem Abed Al Mafraje, who was killed on September 16, 2007. Mr. Al Mafraje brings this action under Iraqi law, alternatively in his individual capacity, as Abrahem Abed Al Mafraje's heir.

16. Sahab Naser Shamake ("Mr. Shamake") is a foreign national and at all times alleged herein was a citizen and resident of Baghdad, Iraq. He is the father of twenty-five year

4

old Mahde Shamake, who was killed on September 16, 2007. Mr. Shamake brings this action under Iraqi law, alternatively in his individual capacity, as Mahde Shamake's heir.

17.     Majid Salman Abed Al-Kareem ("Mr. Al-Kareem") is fifty years old and is a foreign national and at all times alleged herein was a citizen and resident of Baghdad, Iraq. Mr. Al-Kareem is married and is the father of a three-year-old daughter. Mr. Al-Kareem brings this action to recover damages for personal injuries he suffered on September 16, 2007.

18.     Nasear Hamza Latif Rahief ("Mr. Rahief") is sixty-five years old and is a foreign national and at all times alleged herein was a citizen and resident of Baghdad, Iraq. Mr. Rahief is a widower and the father of nine (9) children. Mr. Rahief brings this action to recover damages for personal injuries he suffered on September 16, 2007.

19.     Ghassan Abad Alkarem Mahmood ("Mr. Mahmood") is fifty-three years old and is a foreign national and at all times alleged herein was a citizen and resident of Baghdad, Iraq. Mr. Mahmood is married and the father of two (2) children. Mr. Mahmood brings this action to recover damages for personal injuries he suffered on September 16, 2007.

20.     Upon information and belief, defendant Xe Services LLC ("Xe") is a corporation organized and existing under the laws of the State of Delaware, with its office and principal place of business in McLean, Virginia. Xe regularly and systematically conducts business and maintains a registered agent in North Carolina. Xe was formerly known as EP Investments, LLC, doing business as Blackwater USA and Blackwater Worldwide.

21.     Upon information and belief, defendant Blackwater Security Consulting LLC ("BSC") is a limited liability company organized and existing under the laws of the State of Delaware, with its office and principal place of business in Moyock, North Carolina.

5

22.     Upon information and belief, defendant U.S. Training Center, Inc. ("Training Center") is a corporation organized and existing under the laws of the State of Delaware, with its office and principal place of business in Moyock, North Carolina. Training Center was formerly known as Blackwater Lodge and Training Center, Inc.

23.     Upon information and belief, defendant Raven Development Group LLC ("Raven") is a limited liability company organized and existing under the laws of the State of Delaware, with its office and principal place of business in Moyock, North Carolina.

24.     Upon information and belief, defendant GSD Manufacturing LLC ("GSD") is a limited liability company organized and existing under the laws of the State of Delaware, with its office and principal place of business in Moyock, North Carolina. GSD was formerly known as Blackwater Target Systems, LLC and Blackwater Manufacturing, LLC.

25.     Upon information and belief, defendant Prince Group, LLC ("Prince Group") is a limited liability company organized and existing under the laws of the State of Michigan, with its office and principal place of business in McLean, Virginia. Prince Group regularly and systematically conducts business in the State of North Carolina.

26.     Upon information and belief, defendant Total Intelligence Solutions LLC ("TISL") is a limited liability company organized and existing under the laws of the State of Delaware, with its office and principal place of business in McLean, Virginia. TISL regularly and systematically conducts business in the State of North Carolina.

27.     Upon information and belief, defendant Greystone Limited a/k/a Greystone LTD ("Greystone") is a corporation organized and existing under the laws of Barbados, with its office and principal place of business in Bridgetown, Barbados. Greystone regularly and systematically conducts business in the State of North Carolina.

6

28.     Upon information and belief, defendant Terrorism Research Center, Incorporated ("TRC") is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its office and principal place of business in Arlington, Virginia. TRC regularly and systematically conducts business in the State of North Carolina.

29.     Upon information and belief, defendant Technical Defense Associates, Incorporated ("TDA") is a corporation organized and existing under the laws of the Commonwealth of Virginia with its office and principal place of business in Arlington, Virginia. TDA regularly and systematically conducts business in the State of North Carolina.

30.     Upon information and belief, defendant Aviation Worldwide Services, L.L.C. ("AWS") is a limited liability company organized and existing under the laws of the State of Florida, with its office and principal place of business in Camden, North Carolina. AWS maintains its registered agent in Raleigh, Wake County, North Carolina.

31.     Upon information and belief, defendant Guardian Flight Systems LLC ("GFS"), formerly known as Blackwater Airships LLC, is a limited liability company organized and existing under the laws of the State of Delaware, with its office and principal place of business in Elizabeth City, North Carolina. GFS maintains its registered agent in Raleigh, Wake County, North Carolina.

32.     Upon information and belief, defendant Presidential Airways, Inc. ("PAI") is a corporation organized and existing under the laws of the State of Florida with its office and principal place of business in Camden, North Carolina. PAI maintains its registered agent in Raleigh, Wake County, North Carolina.

33.     Upon information and belief, defendant STI Aviation, Inc. ("STI") is a corporation organized and existing under the laws of the State of Florida with its office and

7

principal place of business in Camden, North Carolina. STI maintains its registered agent in Raleigh, Wake County, North Carolina.

34.     Upon information and belief, defendant Air Quest, Inc. ("AQI") is a corporation organized and existing under the laws of the State of Florida with its office and principal place of business in Camden, North Carolina. AQI maintains its registered agent in Raleigh, Wake County, North Carolina.

35.     Upon information and belief, defendant Samarus CO LTD ("Samarus") is an affiliate, owner and/or member of one or more of the corporate entities identified herein. Plaintiffs are further informed and believe that defendant Erik Prince is an officer and/or director of Samarus. Samarus regularly and systematically conducts business in the State of North Carolina.

36.     Upon information and belief, defendant Erik Prince ("Prince") is a citizen and resident of Fairfax County, Virginia. At all times alleged herein, Prince engaged in substantial personal and business activity in the State of North Carolina. Further, the wrongful deaths and injuries alleged herein arise, in whole or in part, from the acts and/or omissions committed by him within North Carolina.

37.     Upon information and belief, defendant Prince established and/or acquired the entities which comprise Blackwater-Xe. Plaintiffs are further informed and believe that Prince, either individually or through his ownership of the Prince Group LLC, owns and completely dominates and controls the web of companies comprising Blackwater-Xe, such that the entities comprising Blackwater-Xe have no separate mind, will or existence of their own. Upon further information and belief, the entities comprising Blackwater-Xe have, during the relevant period,

8

failed to observe corporate formalities, including the failure to maintain separate books or accountings for each separate entity and otherwise failing to operate as independent entities.

38. Upon information and belief, while Blackwater-Xe was purposefully fragmented into an excessive number of subsidiaries, affiliates, and/or divisions, Prince operated all such entities comprising Blackwater-Xe as a single company.

39. The corporate defendants described above and Prince are hereinafter collectively referred to as "Blackwater-Xe." Upon information and belief, the Blackwater-Xe corporate entities regularly and systematically conduct business with each other, including conducting business with their related entities located in the State of North Carolina.

40. Upon information and belief, defendant Donald Wayne Ball ("Ball") is a citizen and resident of the State of Utah.

41. Upon information and belief, defendant Dustin L. Heard ("Heard") is a citizen and resident of the State of Tennessee.

42. Upon information and belief, defendant Evan Shawn Liberty ("Liberty") is a citizen and resident of the State of New Hampshire.

43. Upon information and belief, defendant Jeremy P. Ridgeway ("Ridgeway") is a citizen and resident of the State of California.

44. Upon information and belief, defendant Nicholas Abram Slatten ("Slatten") is a citizen and resident of the State of Tennessee.

45. Upon information and belief, defendant Paul Alvin Slough ("Slough") is a citizen and resident of the State of Texas.

46. Ball, Heard, Liberty, Ridgeway, Slatten and Slough are hereinafter collectively referred to as "the Indicted Defendants." Upon information and belief and during the relevant

9

period, the Indicted Defendants regularly and systematically conducted business with Blackwater-Xe in the State of North Carolina.

47.    At all times alleged herein, the Indicted Defendants were acting within the course and scope of their employment with and for the benefit of Blackwater-Xe. The actions of the Indicted Defendants were taken with the permission, knowledge, consent and/or ratification of Blackwater-Xe. Unless otherwise indicated, all defendants are hereinafter collectively referred to as "the Defendants."

## FACTUAL BACKGROUND

48.    The entities comprising Blackwater-Xe are a web of companies which were formed and/or acquired by defendant Prince beginning in or about 1996.

49.    Blackwater-Xe has grown to become one of the world's largest providers of private personal protective services and offers a diverse range of services related thereto, including helicopter and air transport services.

50.    The primary operational facility for Blackwater-Xe personnel is located in northeastern North Carolina. The facility is contained on approximately 6,000 acres and Blackwater-Xe has described its facility as the largest such facility in the United States.

51.    Plaintiffs are informed and believe that Prince and the Indicted Defendants engaged in substantial activities and spent significant time working at Blackwater-Xe's North Carolina facility.

52.    On or about August 2003, Blackwater-Xe began providing private personal protective services in Iraq. At that time, Blackwater-Xe was awarded a contract to provide said services to U.S. civilian officials.

10

53.     Blackwater-Xe thereafter entered into a contract with the U.S. State Department known as the "Worldwide Personal Protective Services Contract II" ("the WPPS contract") for the provision of private personal protective services to certain high-level U.S. and foreign governmental officials working in Baghdad, Iraq.

54.     At all times alleged, Blackwater-Xe was obligated to comply with all of the laws of the United States and Iraq.

55.     Blackwater-Xe had a duty and was required to recruit, screen, select and train its employees engaged in providing private personal protective services in Iraq. Blackwater-Xe provided all necessary training facilities for its private personal protection personnel, as well as all equipment, materials and supplies as necessary.

56.     Plaintiffs are informed and believe that at all times alleged Blackwater-Xe performed evaluations of its employees, including the Indicted Defendants. Blackwater-Xe had a duty and was required to take any necessary disciplinary action with respect to its employees and at all relevant times retained the right to supervise, discipline or terminate its employees as necessary.

57.     Plaintiffs are informed and believe that Blackwater-Xe paid travel expenses for those employees hired to provide private personal protective services, including the costs of taxis, hotels and airfare.

58.     Plaintiffs are informed and believe that Blackwater-Xe determined the job assignments, work schedules and work rotations for its employees engaged in providing private personal protective services, including the Indicted Defendants.

59.     Plaintiffs are informed and believe that Blackwater-Xe paid its employees, including the Indicted Defendants, salaries for the private personal protective services they

11

provided pursuant to their employment, and either party could terminate the employment relationship without incurring any liabilities.

60.     At all times alleged, Blackwater-Xe retained the right to direct and control its employees engaged in providing private personal protective services, including the Indicted Defendants.

61.     The U.S. Government has determined that Blackwater-Xe employees, similarly situated to the Indicted Defendants, were employees for whom Blackwater-Xe was required to provide workers' compensation insurance. The U.S. government has further determined that Blackwater-Xe persons, similarly situated to the Indicted Defendants, were employees for purposes of compliance with the tax laws of the United States (*see* **Exhibit 1**).

62.     At all times alleged, Blackwater-Xe retained the right to direct and control its employees engaged in providing private personal protective services pursuant to the WPPS contract.

63.     At all times alleged, Blackwater-Xe's employees, including the Indicted Defendants, were required to follow certain standards and rules of engagement prior to the use of deadly force. These standards include, but are not limited to, the State Department Mission Firearms Policy for Iraq ("the Mission Firearms Policy"). As a condition of their employment with Blackwater-Xe, the Indicted Defendants were required to sign a written acknowledgement agreeing to abide by the use-of-force policies set forth in the Mission Firearms Policy.

64.     The Mission Firearms Policy provided, in part, that "[t]he use of deadly force must be objectively reasonable under all the circumstances known to the individual at the time [and] the necessity to use deadly force arises when all other available means of preventing imminent and grave danger to a specific individual or other person have failed or would be likely

12

to fail." The Mission Firearms Policy further states that "employing deadly force is permissible when there is no safe alternative to using such force and without the use of deadly force, the individual or others would face imminent and grave danger."

65.     At all times alleged, the Indicted Defendants were acting within the course and scope of their employment with Blackwater-Xe. The Indicted Defendants at all times alleged acted in concert to commit the negligent and/or grossly negligent acts described herein and said defendants were engaged in pursuit of a common purpose and design.

### The Indicted Defendants' Misconduct Prior to the Nisur Square Shootings

66.     Plaintiffs are informed and believe that in the year leading up to the Nisur Square shootings, certain of the Indicted Defendants routinely engaged in conduct that was reckless, negligent, in willful violation of applicable laws and demonstrated a total disregard for the safety and welfare of the citizens and residents of Iraq. Said actions and violations of applicable laws demonstrated that the Indicted Defendants were unfit to continue providing private personal protective services. Plaintiffs are further informed and believe that such misconduct included a pattern of unprovoked, aggressive, and dangerous behavior toward unarmed Iraqi civilians in Baghdad, including, but not limited to the following:

(a)     On or about May 23, 2007, defendant Liberty discharged an automatic weapon from the turret of a Blackwater-Xe armored vehicle without aiming the weapon and without regard for who might be struck by the rounds;

(b)     While assigned to turret gun positions, defendants Slough, Slatten and Liberty routinely threw objects, including frozen water bottles, frozen oranges, and other items, at unarmed Iraqi civilians, vehicles, wagons, and

13

bicycles, without justification and to injure and harass innocent civilians, and for sport;

(c)     On or about September 9, 2007, defendant Liberty discharged an automatic weapon from the port hole of a Blackwater-Xe armored vehicle while driving the vehicle, without aiming the weapon and without regard for who might be struck by the rounds;

(d)     During the twelve months preceding the Nisur Square shootings, defendant Slatten repeatedly boasted about the number of Iraqi civilians he had shot; and

(e)     During the twelve months preceding the Nisur Square shootings, defendant Slatten indiscriminately fired his weapon in an attempt to draw return fire and instigate gun battles.

67.     The prior acts of misconduct described herein were inconsistent with the policies and procedures governing the use of force and escalation of force that Blackwater-Xe employees were required to follow, including but not limited to the duty to act as lawful, reasonable and prudent personal protective personnel.

### The Nisur Square Shootings – September 16, 2007

68.     Nisur Square is a traffic circle which serves as a major thoroughfare for traffic in Baghdad. Nisur Square is located just outside a fortified area of central Baghdad known as the "International Zone," also commonly referred to as the "Green Zone." Most of the foreign embassies in Iraq, including the United States Embassy, are located in the International Zone.

69.     On September 16, 2007, the Indicted Defendants were assigned to a convoy of four heavily-armed trucks known as a Tactical Support Team which used the call sign "Raven

14

23." All references to "Raven 23" include the Indicted Defendants. The function of the Tactical Support Team was to assist other Blackwater-Xe personal protective personnel operating in Baghdad. Part of the assistance included the use of Blackwater-Xe helicopters and other aircraft.

70.     On September 16, 2007, at approximately noon, the Raven 23 convoy exited the International Zone without first obtaining the necessary and proper authorization to do so.

71.     At the time and place alleged, Blackwater-Xe employees, including the Indicted Defendants who were members of the Raven 23 convoy, understood that their mission was supportive in nature and that they were not permitted to engage in offensive action, discharge their weapons without first determining the need to do so, use the tactic known as "suppressive fire," or exercise police powers. Rather, Blackwater-Xe's personal protective employees, including the Indicted Defendants, understood that they were only authorized to discharge their firearms in self-defense and as a last resort.

72.     Shortly after the Raven 23 convoy departed from the International Zone on September 16, 2007, plaintiffs are informed and so believe that the Raven 23 convoy was specifically directed by the Regional Security Office of the United States Embassy to return to the International Zone as soon as possible. At this point, the Raven 23 convoy had failed to return to the International Zone as directed. In complete contravention of their authorization under the WPPS contract, the Raven 23 convoy, including the Indicted Defendants, proceeded to set up a blockade at Nisur Square to stop civilian traffic from flowing through the traffic circle.

73.     At the time and place alleged, four heavily-armed vehicles in the Raven 23 convoy entered Nisur Square from the east side of the circle. The Raven 23 convoy was traveling against the flow of traffic and the convoy's four heavily-armed vehicles were then

15

positioned in a line on the southern half of the circle in order to block any traffic from entering the circle from the south or the west.

74. Moments after the Raven 23 convoy entered the traffic circle and before it had been determined it was necessary to do so, the Indicted Defendants acting in concert opened fire on a white Kia sedan which had been approaching the traffic circle from the south. These initial shots killed the driver of the vehicle, who was later identified as a second-year Iraqi medical student. As an Iraqi police officer directing traffic at Nisur Square waived his arms in an effort to prevent further gun fire, defendant Ridgeway fired multiple rounds from his M-4 assault rifle into the front passenger side window of the white Kia sedan, killing the passenger. The passenger in the white Kia sedan was later identified as an Iraqi physician and the mother of the driver.

75. In addition to the shots fired by defendant Ridgeway, several other members of the Raven 23 convoy fired weapons into the white Kia sedan. At least one member of the convoy launched an M-203 grenade at the white Kia sedan, which exploded under the passenger compartment, rupturing and igniting the fuel line and causing the vehicle to erupt in flames. By this time, Blackwater-Xe helicopters had arrived to support the actions of Raven 23 and the Indicted Defendants.

76. Given the fact that shots were initially fired at the white Kia sedan only moments after the Raven 23 convoy arrived at the traffic circle, employees of Blackwater-Xe, including the Indicted Defendants, made no attempt to provide any warnings or instructions to the driver of the white Kia sedan to come to a complete stop prior to their use of deadly force.

77. The Mission Firearms Policy required that prior to the use of deadly force, reasonable warnings should have been given to the Kia sedan, including the use of hand and

16

verbal warnings; firing of pin flares; pointing of weapons at the vehicle; and/or the firing of rounds into the engine block. The Indicted Defendants, all joint participants acting in concert in the Nisur Square shootings, failed to observe any of the required protocols.

78.     As the Raven 23 convoy was situated in and thereafter departed from the intersection at Nisur Square, it proceeded against the flow of traffic to the north of the circle and continued to fire at vehicles and unarmed pedestrians in and around the traffic circle, and at a red bus containing innocent civilians. The Raven 23 convoy then proceeded back to the International Zone on a road north of the traffic circle. As the Raven 23 convoy moved by, Blackwater-Xe's employees, including the Indicted Defendants, continued to fire into the rooftops, windshields and trunks of other civilian vehicles and at pedestrians that posed no threat whatsoever to the convoy.

## The Wrongful Deaths

79.     At the time and place alleged, plaintiff, Mr. Kinani, was driving his Isuzu sport utility vehicle in a northerly direction toward the Nisur Square traffic circle. His automobile was located behind the white Kia sedan and was occupied by his nine-year-old son, Ali Kinani, and four other family members, including his sister and three other small children who were seated in the back seat with Ali Kinani.

80.     The sport utility vehicle driven by Mr. Kinani was fired upon by Blackwater-Xe personnel, including the Indicted Defendants, and was struck at least ten times in the front grill, front windshield and side passenger door.

81.     During the course of the shooting, Mr. Kinani's son, the decedent Ali Kinani, was struck by a bullet in the left side of his head. When Mr. Kinani opened the passenger door to provide aid to his young son, Ali Kinani slumped to his left toward his father. As Mr. Kinani

17

reached to catch his injured son, a portion of Ali Kinani's brain fell out of the open wound in his head and landed between Mr. Kinani's feet on the pavement. A true and accurate photograph of Ali Kinani taken just prior to his death is attached as **Exhibit 2**.

82.     After Blackwater-Xe personnel left Nisur Square, Mr. Kinani drove his vehicle to a hospital located near Nisur Square. Due to the grave nature of his injuries, Ali Kinani was immediately placed in an ambulance for transport to another Baghdad hospital for treatment of his injuries. Ali Kinani died shortly after reaching the second hospital.

83.     At the time and place alleged, Mahde Shamake, a twenty-five-year-old taxi driver, was operating his green Daewoo automobile. His vehicle was located in the northwest corner of the traffic circle facing the opposite direction of the Raven 23 convoy. Mahde Shamake's vehicle was struck from the rear by bullets fired by one or more of the Indicted Defendants. Mahde Shamake suffered a gunshot wound to his back. The nature of the rounds used by the Indicted Defendants was such that a large exit wound was opened in his chest.

84.     Mahde Shamake was taken to a hospital, where he repeatedly asked for water and remained conscious for approximately five hours prior to his death. Mahde Shamake's father, his brothers, and other family members were able to be with him in the hospital but were unable to offer more than comfort before he died.

85.     Abrahem Al Mafraje, a seventy-five-year-old retired farmer, was a passenger in a white Kia minibus. While seated in the white Kia minibus, Abrahem Al Mafraje was struck in the head by a shot fired from the Raven 23 convoy. Abrahem Al Mafraje was transported to a hospital, where he lived for approximately thirty minutes. Abrahem Al Mafraje's son was called to the hospital where he found his father with a large open gunshot wound to his head.

18

## The Personal Injuries

86.     At the time and place alleged, Ghassan Abad Alkarem Mahmood ("Mr. Mahmood"), a fifty-three-year-old engineer and father of five (5) children, was driving a white Kia. He was shot in the head and neck by gunfire from the Raven 23 convoy and remained incapacitated for several months after the shooting. He was unable to walk, stand, hear or attend to his needs for several months. Mr. Mahmood sustained nerve damage to his face and neck and continues to suffer problems with memory, hearing, balance and vision. He has been unable to resume his employment as an engineer and will be unable to work as an engineer in the future.

87.     At the time and place alleged, Nasear Hamza Latif Rahief ("Mr. Rahief"), a sixty-five-year old widower and father of nine (9) children, was a passenger in a minivan taxi. He was shot in the right shoulder by gunfire from the Raven 23 convoy. Mr. Rahief was a produce merchant who supported his family by working in one of Baghdad's open markets. He was unable to work for at least one year due to his injuries.

88.     At the time and place alleged, Majid Salman Abed Al-Kareem ("Mr. Al-Kareem"), a fifty-year old businessman, husband and father of a three-year-old child, was a passenger in a white VW mini-panel truck. When gunfire from the Raven 23 convoy struck his vehicle, he scrambled out of the vehicle and sought cover, but was struck with shrapnel in his shoulder, abdomen, and leg. One or more of the Indicted Defendants fired M-203 grenades into the vehicle in which Mr. Al-Kareem was a passenger. The shrapnel from the grenade struck Mr. Al-Kareem and remains lodged in his body, which causes constant pain and discomfort and prevents him from walking distances or standing for long periods of time.

89.     When the Raven 23 convoy left Nisur Square on the early afternoon of September 16, 2007, at least fourteen (14) Iraqi civilians lay dead or dying and another twenty (20) or more

civilians suffered serious personal injuries. At no time prior to leaving Nisur Square did members of the Raven 23 convoy, including the Indicted Defendants, make any effort to render aid or assistance to those civilians who had been killed or injured.

### Aftermath of the Nisur Square Shootings - The Investigation

90.     Shortly after the September 16, 2007 shootings at Nisur Square, United States military investigators arrived at the scene to conduct their investigation. Despite the fact that Blackwater-Xe had declared publicly that its personnel were justified in the use of deadly force, United States military investigators determined that none of the Iraqi civilians were armed or created any threat to the Indicted Defendants prior to the time of the shootings at Nisur Square. Furthermore, the investigation determined that the shootings were not justified.

91.     According to a United States military official on site in Iraq, Blackwater-Xe's conduct "was obviously excessive, it was obviously wrong."

92.     The Federal Bureau of Investigation ("FBI") was thereafter requested to undertake a complete investigation of the shootings at Nisur Square. Based upon the FBI's investigation, which spanned a number of months and included witness interviews and forensic testing, the FBI concluded that the shootings at Nisur Square were entirely without justification and that the Indicted Defendants' use of deadly force against unarmed Iraqi civilians was not objectively reasonable.

### Aftermath of the Nisur Square Shootings – The Congressional Investigation

93.     In late 2007, the United States Congress, Committee on Oversight and Government Reform ("the Congressional Committee"), launched an investigation into the performance of Blackwater-Xe in Iraq. During its investigation of Blackwater-Xe's activities in Iraq, the Congressional Committee reviewed thousands of pages of documents produced by the

20

U.S. State Department and Blackwater-Xe, including 437 internal Blackwater-Xe "incident reports."

94.     On October 1, 2007, the Majority Staff of the Congressional Committee issued a memorandum concerning Blackwater-Xe's activities in Iraq ("the Congressional Report") prior to a scheduled Congressional hearing.

95.     The Congressional Report noted that in the days following the shootings at Nisur Square, U.S. Military commanders reported that Blackwater-Xe security personnel "have very quick trigger fingers," "shoot first and ask questions later," and "act like cowboys." The Congressional Report further noted that both Blackwater-Xe and State Department records revealed that Blackwater-Xe's use of force in Iraq was frequent and extensive, resulting in significant casualties and property damage. The incidents documented by the Congressional Committee occurred prior to the shootings at Nisur Square and included the following:

    (a)     On June 25, 2005, Blackwater-Xe employees shot and killed an Iraqi man who was reported to the State Department to be the father of six and an innocent person standing on the side of the street. According to an internal State Department document, the Blackwater-Xe personnel who fired the shots initially failed to report the shooting and sought to cover it up;

    (b)     On October 24, 2005, an unarmed civilian bystander was shot in the head by a Blackwater-Xe employee who fired his weapon in order to disable a nearby vehicle. The Blackwater-Xe employees did not stop to render aid or assistance to the civilian;

21

(c)     On November 28, 2005, one or more Blackwater-Xe vehicles, operated by Blackwater-Xe employees, collided with 18 different civilian vehicles. A Blackwater-Xe employee later reported that another Blackwater-Xe employee "openly admitted giving clear direction to the primary driver to conduct these acts of random negligence for no apparent reason;"

(d)     On September 24, 2006, a civilian vehicle was forced off the roadway to avoid vehicles operated by Blackwater-Xe employees that had been driving down the wrong side of a road at forty-five miles per hour. The civilian driver crashed into a telephone pole at the side of the road. The involved Blackwater-Xe employees left the scene without attempting to assist the occupants of the Iraqi civilian's vehicle, which was described as "a ball of flames;" and

(e)     On December 24, 2006, a drunken Blackwater-Xe employee shot and killed a security guard to Iraqi Vice President Adil Abd-Al-Mahdi, while in the International Zone.

96.     The Congresssional Report stated that the incident reports obtained during its investigation described a number of incidents involving Iraqi civilian casualties that had not previously been reported.

97.     Despite the fact that Blackwater-Xe was legally bound to only engage in defensive uses of force to prevent "imminent and grave danger," the Congressional Committee's investigation revealed that the vast majority of Blackwater-Xe's weapons discharges were preemptive, with Blackwater-Xe personnel firing prior to receiving any fire. In fact, Blackwater-Xe's internal incident reports reflected that in 84% of shooting incidents, Blackwater-Xe

22

personnel were the first to fire. The Congressional Committee further determined from its review of internal incident reports that in the vast majority of incidents in which Blackwater-Xe engaged in weapons fire, its personnel fired from a moving vehicle and failed to remain at the scene to determine if their shots resulted in casualties.

98.     Prior to the shootings at Nisur Square, Blackwater-Xe employees engaged in a disturbing pattern and practice of failing to follow required rules of engagement and other requirements to act reasonably and prudently before discharging their weapons, including but not limited to, the Mission Firearms Policy. The negligent and reckless conduct of Blackwater-Xe's employees resulted in the needless deaths and injuries to numerous innocent Iraqi civilians.

99.     Prior to September 16, 2007, Blackwater-Xe was fully aware of the numerous incidents involving Blackwater-Xe's shootings of innocent Iraqi civilians and the need to provide additional supervision or to take other corrective action to prevent and avoid further needless injuries and loss of innocent human life.

100.    Plaintiffs are further informed and believe that prior to the shootings at Nisur Square, Blackwater-Xe had been warned by governmental officials of the need to take such corrective action. Despite such warnings, Blackwater-Xe failed to take reasonable measures to address and curtail the unlawful and reckless conduct of its employees directed at innocent Iraqi civilians.

### Condolences from the State Department

101.    Following the death of Ali Kinani, his father, plaintiff Mohammed Kinani, received a letter dated November 17, 2008 from Ambassador Patricia Butenis, Deputy Chief of Mission with the United States Embassy in Iraq. In her letter, a copy of which is attached hereto

23

as **Exhibit 3**, Ambassador Butenis stated that on behalf of the U.S. State Department, "I again wish to express our condolences to you and your family for your tragic loss."

102.    In addition to Ambassador Butenis' letter, the State Department provided an *"ex gratia"* payment to Mr. Kinani in the amount of $10,000, and advised him that acceptance of the payment "does not impose any restrictions or obligations on you of any kind and **is without prejudice to any legal action that you might initiate in United States courts."** (Emphasis supplied). As an expression of his gratitude to U.S. servicemen who had lost their lives fighting for Iraqi freedom, Mr. Kinani later returned $5,000 of the $10,000 he had been given, with instructions to donate the money to the family of an American soldier killed while serving in Iraq.

103.    On June 25, 2009, the U.S. Army Commanding General, Raymond T. Odierno, wrote Mr. Kinani expressing his sorrow for the loss of his son, Ali Kinani, during the shooting at Nisur Square. In the letter, a copy of which is attached hereto as **Exhibit 4**, General Odierno thanked Mr. Kinani for his generosity to the families of fallen American soldiers serving in Iraq.

### Aftermath of the Nisur Square Shootings – The Indictment and the Guilty Plea

104.    On December 4, 2008, a federal grand jury in the District of Columbia returned a thirty-five (35) count Indictment against defendants Ball, Heard, Liberty, Slatten and Slough. These Indicted Defendants were each charged with multiple counts of voluntary manslaughter, attempt to commit manslaughter, aiding and abetting and causing an act to be done, and a related weapons offense. All of the Indicted Defendants named in the indictment were charged jointly with all of the offenses alleged. A true and accurate copy of the Indictment is attached hereto as **Exhibit 5**.

24

105. Defendant Ridgeway was charged through a criminal information and has entered a plea of guilty.

106. In his Factual Proffer in Support of Guilty Plea ("the Proffer"), Ridgeway admitted that at least six members of the Raven 23 convoy, including all of the named Indicted Defendants, negligently and unjustifiably opened fire with automatic weapons and grenade launchers on unarmed civilians located in and around Nisur Square. In the Proffer, Ridgeway further admitted that none of the victims shot at Nisur Square was an insurgent, that many were shot while inside of civilian vehicles attempting to flee from the Raven 23 convoy, and that one victim was shot in his chest while standing in the street with his hands up.

107. In the Proffer, Ridgeway admitted that he, as well as the other Indicted Defendants, understood that they were only authorized to discharge their firearms in self-defense and as a last resort. Ridgeway further admitted that the Nisur Square shootings did not occur for purposes of "self-defense" or as a "last resort." Ridgeway further admitted that he, along with the other members of the Raven 23 convoy, had failed to follow and had completely disregarded the Mission Firearms Policy and/or other applicable rules of engagement. A true and accurate copy of the Proffer is attached hereto as **Exhibit 6**.

### **The John Doe Declarations**

108. In July of 2009, two former Blackwater-Xe employees employed to provide personal protective services in Baghdad, provided declarations in legal proceedings pending in the United States District Court for the Eastern District of Virginia (the "Declarations"). The Declarations were provided under the name "John Doe" due to these employees' fears of economic and/or physical retaliation. The former Blackwater-Xe employees, under penalty of perjury, stated the following:

25

(a)    The employees personally observed multiple incidents of Blackwater-Xe's private protective service employees intentionally using unnecessary, excessive and unjustified deadly force;

(b)    Blackwater-Xe was aware that its personal protective personnel frequently used excessive and unjustified deadly force to kill or seriously injure Iraqi civilians and that Blackwater-Xe failed to take appropriate and necessary steps to stop or prevent such misconduct in the future;

(c)    Blackwater-Xe failed to take any disciplinary action against employees who had used unnecessary deadly force;

(d)    On those occasions when Blackwater-Xe personal protective personnel improperly used deadly force, its employees failed to stop and render assistance to those unarmed Iraqi civilians that had been shot;

(e)    Blackwater-Xe employees used weapons which were not authorized under the WPPS contract;

(f)    Despite knowledge of the incidents involving improper use of deadly force, Blackwater-Xe's supervisors failed to take any disciplinary action against these employees;

(g)    Blackwater-Xe management, including defendant Erik Prince, ignored the advice and pleas of certain Blackwater-Xe employees who sought to stop and/or prevent the unnecessary killings of Iraqi civilians; and

(h)    Despite the knowledge of Blackwater-Xe management that certain employees were failing to operate within the requirements of the WPPS

26

contract, including restrictions on the use of deadly force, such employees were nonetheless retained as security personnel.

109. As established through the "John Doe" affidavits, and otherwise, Blackwater-Xe management cultivated and condoned a culture of reckless and unlawful conduct, in complete disregard of the specifications and requirements of the WPPS contract and other applicable duties and standards.

## FIRST CLAIM FOR RELIEF – AGAINST INDICTED DEFENDANTS

### (Wrongful Death – N.C. Gen. Stat. § 28A-18-2)

110. Plaintiffs reallege and incorporate by reference paragraphs 1 through 109 of their Complaint as if fully set forth herein.

111. At all times alleged herein, the Indicted Defendants owed to Iraqi civilians, including Decedents, a duty to use reasonable care. The Indicted Defendants owed the Decedents duties of care imposed by Blackwater-Xe's own policies and rules, and otherwise imposed by applicable laws and rules of conduct and engagement (e.g. the Mission Firearms Policy). The Indicted Defendants, through their acts and omissions as alleged herein, failed to exercise proper, reasonable and due care under the circumstances then existing on September 16, 2007 at Nisur Square.

112. The negligent and grossly negligent acts and omissions of the Indicted Defendants include, but are not limited to the following:

      (a)    Negligently proceeding to Nisur Square without just cause to do so;

      (b)    Establishing a blockade at Nisur Square to stop the flow of civilian traffic moving through the traffic circle, when such actions were unauthorized and unnecessary;

27

(c)   Opening fire on civilians at Nisur Square when said defendants knew, or reasonably should have known, that the innocent civilians were unarmed and posed no threat to the Raven 23 convoy;

(d)   Firing their weapons within moments of entering Nisur Square, without first determining it was necessary to do so, and failing to make any attempt to provide reasonable warnings prior to their use of deadly force;

(e)   Failing to follow required standards and rules of engagement prior to the use of deadly force, including but not limited to the Mission Firearms Policy; and

(f)   Failing to act with reasonable care in other ways as may be revealed through discovery and shown at trial.

113.   As a direct and proximate result of the Indicted Defendants' negligence and gross negligence, Mr. Brady, in his representative capacity as the administrator of the Estates of Ali Kinani, Abrahem Al Mafraje and Mahde Shamake, is entitled to recover from the Indicted Defendants, jointly and severally, an amount sufficient to compensate each Estate for damages allowed under N.C. Gen. Stat. § 28A-18-2(b), including medical expenses, pain and suffering, reasonable funeral expenses, loss of society, companionship, comfort, guidance, kindly offices and advice of the Decedents, the claim of each Estate being in excess of $10,000.00.

## SECOND CLAIM FOR RELIEF - AGAINST INDICTED DEFENDANTS

### (Wrongful Death - Alternative Claim under Iraqi Law)

114.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 113 of their Complaint as if fully set forth herein.

28

115.    At all times alleged herein, the Indicted Defendants owed to Iraqi civilians, including Decedents, a duty under Iraqi law to use reasonable and due care. The Indicted Defendants, through their acts and omissions as alleged herein, failed to exercise proper, reasonable and due care under the circumstances then existing on September 16, 2007 at Nisur Square.

116.    The negligent and grossly negligent acts and omissions of the Indicted Defendants include those set forth above.

117.    As a direct and proximate result of the Indicted Defendants' negligence and gross negligence, Mohammed Hafedh Abdulrazzaq Kinani, Kalled Abrahem, Sahab Naser Shamake, heirs of Ali Kinani, Abrahem Abed Al Mafraje and Mahde Sahad Naser Shamake, respectively, are entitled to recover from the Indicted Defendants, jointly and severally, an amount sufficient to compensate each heir for damages allowed under Iraqi law, including medical expenses, pain and suffering, reasonable funeral expenses, moral damage, including loss of society, companionship, comfort, guidance, kindly offices and advice of the Decedents, the claim of each heir being in excess of $10,000.00.

### THIRD CLAIM FOR RELIEF - AGAINST INDICTED DEFENDANTS

#### (Negligence Causing Personal Injury - North Carolina Law)

118.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 117 of their Complaint as if fully set forth herein.

119.    At all times alleged herein, the Indicted Defendants owed to Iraqi civilians, including Majid Salman Abed Al-Kareem, Nasear Hamza Latif Rahief, and Ghassan Abad Alkarem Mahmood, a duty to use reasonable care. The Indicted Defendants also owed said plaintiffs duties of care imposed by Blackwater-Xe's own internal policies and rules, and by

29

other applicable rules of conduct and engagement. The Indicted Defendants, through their grossly negligent acts and omissions as alleged herein, failed to exercise proper, reasonable and due care under the circumstances then existing on September 16, 2007 at Nisur Square.

120.    The negligent and grossly negligent acts and omissions of the Indicted Defendants include those set forth above.

121.    As a direct and proximate result of the negligence and gross negligence of the Indicted Defendants, Majid Salman Ahed Al-Kareem, Nasear Hamza Latif Rahief, and Ghassam Abad Alkarem Mahmood, are entitled to recover damages from the Indicted Defendants, jointly and severally, in an amount sufficient to compensate said plaintiffs for personal injuries; past and future medical expenses; past and future pain and suffering; loss of wages; loss of earning capacity; permanent scars and disfigurement; mental and emotional distress; loss of capacity for enjoyment of life; property damage; and other damages, together with interest as allowed by law, the claim of each plaintiff being in excess of $10,000.00.

## FOURTH CLAIM FOR RELIEF – AGAINST INDICTED DEFENDANTS

### (Negligence Causing Personal Injury - Alternative Claim under Iraqi Law)

122.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 121 of their Complaint as if fully set forth herein.

123.    At all times alleged, the Indicted Defendants owed to Iraqi civilians, including Majid Salman Ahed Al-Kareem, Nasear Hamza Latif Rahief, Ghassan Abad Alkarem Mahmood, a duty under Iraqi law to use reasonable care. The Indicted Defendants, through their acts and omissions as alleged herein, failed to exercise proper and reasonable care under the circumstances then existing on September 16, 2007 at Nisur Square.

30

124. The negligent and grossly negligent acts and omissions of the Indicted Defendants include those set forth above.

125. As a direct and proximate result of the Indicted Defendants' negligence and gross negligence, Majid Salman Abed Al-Kareem, Nasear Hamza Latif Rahief, and Ghassan Abad Alkarem Mahmood, are entitled to recover damages from the Indicted Defendants, jointly and severally, in an amount sufficient to compensate said plaintiffs for damages allowed under Iraqi law, including damages for personal injuries; past and future medical expenses; past and future pain and suffering; loss of wages; loss of earning capacity; permanent scars and disfigurement; mental and emotional distress; loss of capacity for enjoyment of life; property damage; moral damage; and other damages, together with interest as allowed by law, the claim of each plaintiff being in excess of $10,000.00.

## FIFTH CLAIM FOR RELIEF – AGAINST BLACKWATER-XE

**(Vicarious Liability for Wrongful Death - N.C. Gen. Stat. § 28A-18-2 and Personal Injury)**

126. Plaintiffs reallege and incorporate by reference paragraphs 1 through 125 of their Complaint as if fully set forth herein.

127. At all times alleged, Blackwater-Xe, knew or reasonably should have known that it was engaged in an activity that was both ultrahazardous and inherently dangerous. As such, Blackwater-Xe assumed a nondelegable duty to exercise the utmost care so as to avoid unnecessary injuries and deaths of Iraqi civilians.

128. At all times alleged, the Indicted Defendants owed to Iraqi civilians, including the Decedents and those plaintiffs alleging claims for personal injury, a duty to use reasonable care. The Indicted Defendants, through their acts and omissions as alleged herein, failed to exercise

31

proper and reasonable care under the circumstances then existing on September 16, 2007 at Nisur Square.

129. The negligent and grossly negligent acts and omissions of the Indicted Defendants include those set forth above.

130. At all times alleged, the Indicted Defendants were otherwise acting in the course and scope of their employment and for the benefit of Blackwater-Xe.

131. Blackwater-Xe is liable for the acts and omissions of the Indicted Defendants based upon its assumption of a nondelegable duty and under the doctrine of *respondeat superior*.

132. In the alternative, after acquiring knowledge of all material facts concerning the shootings at Nisur Square on September 16, 2007, Blackwater-Xe, through its words and conduct ratified and condoned the conduct of the Indicted Defendants, all Blackwater-Xe employees, as alleged herein. Following the shootings at Nisur Square, Blackwater-Xe stated publicly that its officials had investigated the facts surrounding the incident, that Blackwater-Xe approved of and condoned the Indicted Defendants' conduct, that the Indicted Defendants were fully justified in their actions, and that the Indicted Defendants had acted properly at all relevant times as employees of Blackwater-Xe.

133. As a direct and proximate result of the Indicted Defendants' negligence and gross negligence, Mr. Brady, in his representative capacity as the administrator of the Estates of the Decedents is entitled to recover from Blackwater-Xe, under theories of vicarious liability, an amount sufficient to compensate each Estate for damages allowed under N.C. Gen. Stat. § 28A-18-2(b), including medical expenses, pain and suffering, reasonable funeral expenses, loss of society, companionship, comfort, guidance, kindly offices and advice of the Decedents, the claim of each Estate being in excess of $10,000.00.

32

134.    As a direct and proximate result of the negligence and gross negligence of the Indicted Defendants, Majid Salman Ahed Al-Kareem, Nasear Hamza Latif Rahief, and Ghassan Abad Alkarem Mahmood, are entitled to recover damages from Blackwater-Xe, under theories of vicarious liability, in an amount sufficient to compensate said plaintiffs for personal injuries; past and future medical expenses; past and future pain and suffering; loss of wages; loss of earning capacity; permanent scars and disfigurement; mental and emotional distress; loss of capacity for enjoyment of life; property damage; and other damages, together with interest as allowed by law, the claim of each plaintiff being in excess of $10,000.00.

## SIXTH CLAIM FOR RELIEF- AGAINST BLACKWATER-XE

### (Wrongful Death and Personal Injury - Alternative Claim for Vicarious Liability under Iraqi Law)

135.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 134 of their Complaint as if fully set forth herein.

136.    At all times alleged herein, the Indicted Defendants owed to Iraqi civilians, including the Decedents and those plaintiffs alleging personal injuries, a duty to use reasonable care. The Indicted Defendants, through their negligent and grossly negligent acts and omissions as alleged, failed to exercise proper, reasonable, and due care under the circumstances then existing on September 16, 2007 at Nisur Square.

137.    The negligent and grossly negligent acts and omissions of the Indicted Defendants include those set forth above.

138.    At all times alleged herein, the Indicted Defendants were acting in the course and scope of their employment and for the benefit of Blackwater-Xe.

139.    Blackwater-Xe is vicariously liable for the negligent and grossly negligent acts and omissions of the Indicted Defendants under Iraqi law.

33

140.    As a direct and proximate result of the Indicted Defendants' negligence and gross negligence, Mohammed Hafedh Abdulrazzaq Kinani, Kalled Abrahem, Sahab Naser Shamake, heirs of Ali Kinani, Abrahem Abed Al Mafraje and Mahde Sahad Naser Shamake, respectively, are entitled to recover damages from Blackwater-Xe, under theories of vicarious liability, in an amount sufficient to compensate each heir for damages allowed under Iraqi law, including medical expenses; pain and suffering; reasonable funeral expenses; moral damage; including loss of society, companionship, comfort, guidance, kindly offices and advice of the Decedents, the claim of each heir being in excess of $10,000.00.

141.    As a direct and proximate result of the Indicted Defendants' negligence and gross negligence, Majid Salman Abed Al-Kareem, Nasear Hamza Latif Rahief, and Ghassan Abad Alkarem Mahmood, are entitled to recover damages from Blackwater-Xe, under theories of vicarious liability, in  an amount sufficient to compensate said plaintiffs for damages allowed under Iraqi law, including damages for personal injuries; past and future medical expenses; past and future pain and suffering; loss of wages; loss of earning capacity; permanent scars and disfigurement; mental and emotional distress, loss of capacity for enjoyment of life, property damage, moral damage, and other damages, together with interest as allowed by law, the claim of each plaintiff being in excess of $10,000.00.

## SEVENTH CLAIM FOR RELIEF- AGAINST BLACKWATER-XE

### (Direct Liability for Wrongful Death – N.C. Gen. Stat. § 28A-18-2 and Personal Injury - Negligent Supervision )

142.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 141 of their Complaint as if fully set forth herein.

143.    At all times alleged, Blackwater-Xe had a duty to properly supervise its employees, including the Indicted Defendants, in the discharge of their duties.  Blackwater-Xe

34

knew or should have known that its failure to properly supervise its employees created an unreasonable risk of harm to innocent Iraqi civilians.

144. Prior to the shootings at Nisur Square, Blackwater-Xe was aware that its employees had engaged in a pattern and practice of failing to follow the requirements and rules applicable to their work, including but not limited to, the use of deadly force under circumstances which were not justified and that were in clear violation of the Mission Firearms Policy. Despite such knowledge, Blackwater-Xe failed to take those reasonable and necessary actions to protect Iraqi civilians, including but not limited to, providing appropriate and increased supervision of its employees and eliminating its corporate culture of condoning reckless and unlawful conduct. Specifically, Blackwater-Xe failed to properly supervise the Indicted Defendants. Blackwater-Xe's abject failure to properly supervise the Indicted Defendants constituted negligence and gross negligence.

145. As a direct and proximate result of Blackwater-Xe's negligent and grossly negligent breach of its duty to provide proper and necessary supervision of its employees, including the Indicted Defendants, Mr. Brady, in his representative capacity as the administrator of the Estates of Decedents is entitled to recover damages from Blackwater-Xe, under theories of direct liability, in an amount sufficient to compensate each Estate for damages allowed under N.C. Gen. Stat. § 28A-18-2(b), including medical expenses; pain and suffering; reasonable funeral expenses; loss of society; companionship; comfort; guidance; kindly offices and advice of the Decedents, the claim of each Estate being in excess of $10,000.00.

146. As a direct and proximate result of Blackwater-Xe's negligence and gross negligence, Majid Salman Abed Al-Kareem, Nasear Hamza Latif Rahief, and Ghassan Abad Alkarem Mahmood, are entitled to recover damages from Blackwater-Xe, under theories of

35

direct liability, in an amount sufficient to compensate said plaintiffs for personal injuries; past and future medical expenses; past and future pain and suffering; loss of wages; loss of earning capacity; permanent scars and disfigurement; mental and emotional distress; loss of capacity for enjoyment of life; property damage; moral damage; and other damages, together with interest as allowed by law, the claim of each plaintiff being in excess of $10,000.00.

## EIGHTH CLAIM FOR RELIEF- AGAINST BLACKWATER XE

### (Direct Liability for Wrongful Death – N.C. Gen. Stat. § 28A-18-2 and Personal Injury – Negligent Retention)

147. Plaintiffs reallege and incorporate by reference paragraphs 1 through 146 of their Complaint as if fully set forth herein.

148. At all times alleged, Blackwater-Xe had a duty to retain only competent, qualified, and rule-compliant employees to perform personal protective services under the WPPS contract.

149. Upon information and belief, prior to the shootings at Nisur Square, Blackwater-Xe had engaged in a negligent and grossly negligent pattern and practice of retaining employees who had demonstrated that they were unfit to perform their duties, without creating an unreasonable risk of injury and death to Iraqi civilians.

150. Despite the knowledge of Blackwater-Xe management that certain employees were failing to operate within the bounds of the various rules and standards imposed upon them, including rules and standards imposed not only for their safety but also for the safety of innocent Iraqi civilians, Blackwater-Xe continued to retain such unfit employees.

151. Plaintiffs are further informed and believe that at the time of the Nisur Square shootings, Blackwater-Xe, knew or reasonably should have known that the Indicted Defendants, based upon their demonstrated course of prior misconduct, including but not limited to those acts

36

described above, were unfit to continue their employment with Blackwater-Xe. Hence, the retention of the Indicted Defendants by Blackwater-Xe created an unreasonable risk of injury and death to Iraqi civilians. Blackwater-Xe's conduct in this regard constituted negligence and gross negligence.

152. As a direct and proximate result of Blackwater-Xe's negligent and grossly negligent breach of its duty to retain only competent, qualified, and rule-compliant employees, Mr. Brady, in his representative capacity as the administrator of the Estates of Decedents is entitled to recover damages from Blackwater-Xe, under theories of direct liability, in an amount sufficient to compensate each Estate for damages allowed under N.C. Gen. Stat. § 28A-18-2(b), including medical expenses; pain and suffering; reasonable funeral expenses; loss of society, companionship, comfort, guidance, kindly offices and advice of the Decedents, the claim of each Estate being in excess of $10,000.00.

153. As a direct and proximate result of Blackwater-Xe's negligence and gross negligence, Majid Salman Abed Al-Kareem, Nasear Hamza Latif Rahief, and Ghassan Abad Alkarem Mahmood, are entitled to recover damages from Blackwater-Xe, under theories of direct liability, in an amount sufficient to compensate said plaintiffs for personal injuries; past and future medical expenses; past and future pain and suffering; loss of wages; loss of earning capacity; permanent scars and disfigurement; mental and emotional distress; loss of capacity for enjoyment of life; property damage; moral damage and other damages, together with interest as allowed by law, the claim of each plaintiff being in excess of $10,000.00.

## NINTH CLAIM FOR RELIEF- AGAINST ALL DEFENDANTS

### (Punitive Damages - N.C. Gen. Stat. § 1D-1, *et. seq.*)

154. Plaintiffs reallege and incorporate by reference paragraphs 1 through 153 of their Complaint as if fully set forth herein.

155. The conduct of the Indicted Defendants, as alleged with more particularity above, constitutes willful and wanton conduct, demonstrating a conscious and intentional disregard of and indifference to the rights and safety of the Decedents and those Plaintiffs injured during the Nisur Square shootings. The Indicted Defendants knew or reasonably should have known that their conduct was likely to result in death or serious injury.

156. At all times alleged herein, Blackwater-Xe participated in and/or condoned and ratified the willful and wanton conduct described herein.

157. As a direct and proximate result of Defendants' willful and wanton conduct, Plaintiffs are entitled to recover from Defendants, jointly and severally, punitive damages in an amount to be determined by the trier of fact.

WHEREFORE, Plaintiffs respectfully pray the Court for the following relief:

1. That Plaintiffs have and recover compensatory damages against Defendants, jointly and severally, the claim of each plaintiff being in excess of $10,000;

2. That Plaintiffs have and recover punitive damages against Defendants, jointly and severally, in an amount to be determined by the trier of fact;

3. That the costs of this action be taxed against Defendants as may be allowed by law;

4. That Plaintiffs have and receive a trial by jury; and

5. That the Court award such other and further relief as it deems just and proper.

38

This. the 15th day of September 2009.

LEWIS & ROBERTS, PLLC

By: _____
James A. Roberts, III
N.C. State Bar No. 10495
Brooke N. Albert
N.C. State Bar No. 36584
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Tel: (919) 981-0191
Fax: (919) 981-0199
E-m: jimroberts@lewis-roberts.com
      brookealbert@lewis-roberts.com

LEWIS & ROBERTS, PLLC

By: _____
Gary V. Mauney
N.C. State Bar No. 22190
Paul R. Dickinson, Jr.
N.C. State Bar No. 20510
5960 Fairview Road, Suite 102
Charlotte, NC 28210
Tel:    (704) 347-8990
Fax:   (704) 347-8929
E-m:   garymauney@lewis-roberts.com
        pauldickinson@lewis-roberts.com

39



**EXHIBIT**

1

Internal Revenue Service
SB/SE, Compliance
BIRSC, SS-8 Unit

Date: March 30, 2007

Department of the Treasury
40 Lakemont Road
Newport, VT 05855-1555

Blackwater Security Consulting LLC
c/o Blackwater Lodge & Training Center
850 Puddin Ridge Rd.
Moyock, NC 27958-8679-504

Form: SS-8

Person to Contact:
Donald Howell 03-00401

Telephone Number: 802-751-4445
Facsimile Number: 802-751-4454

Refer Reply to: Case # 49728

Dear Sir or Madam:

This is in response to a Form SS-8 that was submitted to request a determination of employment status for Federal employment tax purposes, between Blackwater Security Consulting LLC, hereafter referred to as the firm, and ▮▮▮▮▮▮▮▮▮, hereafter referred to as the worker, for services he performed in 2005.

We hold the worker to have been an employee of the firm. In the rest of this letter, we will explain the facts, law, and rationale that form the basis for this finding.

According to the information submitted, the firm is a broker that recruits candidates for the position of security professional pursuant to a very detailed set of standards dictated by the U. S. Government Agency at issue. The firm engaged the worker to perform security services as a Personal Security Specialist. The firm required the worker to personally perform his services for its client at a U.S. installation in Afghanistan. The worker followed instructions regarding his assignment from the firm's client in Afghanistan. The worker worked a specific schedule as determined by the client.

The firm paid the worker's travel expenses such as his taxi, hotel, and air fare. The firm submitted a written agreement between the firm and worker to provide the services. The agreement explained the type of work, work rotation, and that the worker's services were an essential part of the services that the firm offers its clients. The firm performed an evaluation and had the right to suspend the worker for violating its procedures. The firm's client paid the firm for its services and the firm paid the worker a salary for the security services he performed for the client. Both parties could terminate the work relationship without incurring any liabilities.

Section 3121(d)(2) of the Internal Revenue Code provides that the term "employee" means any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of employee.

The question of whether an individual is an independent contractor or an employee is one of fact to be determined upon consideration of the facts and the application of the law and regulations in a particular case. Guides for determining the existence of that status are found in three substantially similar sections of the Treasury Regulations. They are sections 31.3121(d)-1, 31.3306(i)-1, and 31.3401(c)-1 relating to the Federal Insurance Contributions Act (FICA), the Federal Unemployment Tax Act (FUTA), and Federal income tax withholding on wages at source, respectively.

Section 31.3121(d)-1(c)(2) of the regulations provides that generally, the relationship of employer and employee exists when the person for whom the services are performed has the right to control and direct the individual who performs the services not only as to the results to be accomplished by the work, but also as to the details and means by which the result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done, but also as to how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which services are performed; it is sufficient if he or she has the right to do so. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished and not as to the means and methods for accomplishing the result, he or she is an independent contractor.

In determining whether an individual is an employee or an independent contractor under the common law, all evidence of both control and lack of control or autonomy must be considered. In doing so, one must examine the relationship of the worker and the business. Facts that illustrate whether there is a right to direct or control how the worker performs the specific tasks for which he or she is hired, whether there is a right to direct or control how the financial aspects of the worker's activities are conducted, and how the parties perceive their relationship provide evidence of the degree of control and autonomy.

Section 31.3121(d)-1(a)(3) of the regulations provides that if the relationship of an employer and employee exists, the designation or description of the parties as anything other than that of employer and employee is immaterial. Thus, if an employer-employee relationship exists, any contractual designation of the employee as a partner, coadventurer, agent, or independent contractor must be disregarded.

Therefore, your statement that the worker was an independent contractor pursuant to a written agreement is without merit. For Federal employment tax purposes, it is the actual working relationship that is controlling and not the terms of the contract (oral or written) between the parties.

We have applied the law, regulations, and principles as cited above to the information submitted. As is the case in almost all worker classification cases, some facts point to an employment relationship while other facts indicate independent contractor status. The determination of the worker's status, therefore, rests on the weight given to the factors under the common law, keeping in mind that no one factor is determinative of a

worker's status. The degree of importance of each factor varies depending on the occupation and the factual context in which the services are performed. In weighing the evidence, careful consideration has been given to the factors outlined below.

Under the common law, the relationship of employer and employee exists when the person for whom the services are performed has the right to control not only what is done, but also how it is done. Evidence of control generally falls into three categories: behavioral controls, financial controls, and relationship of the parties, which are collectively referred to as the categories of evidence.

Factors that illustrate whether there is a right to control how a worker performs a task include training and instructions. In this case, you retained the right to change the worker's methods and to direct the worker to the extent necessary to protect your financial investment. You provided the job assignment to the worker and, although your client provided the worker with the details regarding the services, you expected the worker to provide specific security services as required.

A worker who is required to comply with another person's instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present if the person or persons for whom the services are performed have the right to require compliance with instructions. Some employees may work without receiving instructions because they are highly proficient and conscientious workers or because the duties are so simple or familiar to them. Furthermore, the instructions that show how to reach the desired results may have been oral and given only once at the beginning of the relationship. See, for example, Rev. Rul. 68-598, 1968-2 C.B. 464, and Rev. Rul. 66-381, 1966-2 C.B. 449.

Factors that illustrate whether there is a right to direct and control the financial aspects of the worker's activities include significant investment, unreimbursed expenses, the methods of payment, and the opportunity for profit or loss. In this case, the worker did not invest capital or assume business risks, and therefore, did not have the opportunity to realize a profit or incur a loss as a result of his services. You paid the worker's traveling expenses to the location of services and you paid his salary to perform his services.

If the person or persons for whom the services are performed ordinarily pay the worker's business and/or traveling expenses, the worker is ordinarily an employee. An employer, to be able to control expenses, generally retains the right to regulate and direct the worker's business activities. See Rev. Rul. 55-144, 1955-1 C.B. 483.

Factors that illustrate how the parties perceive their relationship include the intent of the parties as expressed in written contracts; the provision of, or lack of employee benefits; the right of the parties to terminate the relationship; the permanency of the relationship; and whether the services performed are part of the service recipient's regular business activities. In this case, both parties retained the right to terminate the work relationship at any time without incurring a liability. The worker was not engaged in an independent enterprise, but rather the services performed by the worker were essential to your client, as your client was dependent on you providing the necessary people with specific security skills, and a necessary and integral part of your business.

Integration of the worker's services into the business operations generally shows that the worker is subject to direction and control. When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the workers who perform those services must necessarily be subject to a certain amount of control by the owner of the business.

In evaluating the facts in this case, it is clear that the worker performed services in a manner consistent with an employer-employee relationship. Applying the law, regulations, and principles set forth in various revenue rulings and court cases, as well as the categories of evidence outlined above, we conclude that the worker was an employee of the firm for Federal employment tax purposes, and not an independent contractor engaged in his own trade or business.

Compensation to an individual classified as an employee is subject to Federal income tax withholding, Federal Insurance Contributions Act tax (FICA), and Federal Unemployment Tax Act (FUTA) tax as provided by sections 3101, 3301, and 3401 of the Internal Revenue Code, and it is possible you are liable for the same.

Section 530 of the 1978 Revenue Act established a safe haven from an employer's liability for employment taxes arising from an employment relationship. This relief may be available to employers who have misclassified workers if they meet certain criteria. This is explained more fully in the enclosed fact sheet. It is important to note that this office does not have the authority to grant section 530 relief in relation to this determination. Section 530 relief is officially considered and possibly granted by an auditor at the commencement of the examination process should IRS select your return(s) for audit. The SS-8 determination process is not related to an examination of your returns. There is also no procedure available to you by which you can request an audit for the purpose of addressing your eligibility for section 530 relief. You should contact a tax professional if you need assistance with this matter.

If you are not eligible for section 530 relief, section 3509 of the Code provides that if an employer fails to deduct and withhold any tax under chapter 24 (income tax withholding) or subchapter A of Chapter 21 (employee portion of FICA tax) with respect to any employee by reason of treating an employee as not being an employee, the employer's liability is 1.5 percent of the employee's wages plus 20 percent of the employee's portion of the FICA tax. The employer's liability is doubled in cases where the employer failed to meet the reporting requirements of sections 6041(a) or 6051 consistent with the treatment of the employees as independent contractors. You must pay the full amount of the employer's share of FICA taxes and the full amount of tax under the FUTA.

Section 3509(c) provides that the reduced rates of section 3509 do not apply in cases of an employer's intentional disregard of the requirement to deduct and withhold such tax and do not apply in any period within the current calendar year.

This determination is based on the application of law to the information presented to us and/or discovered by us during the course of our investigation; however, we are not in a position to personally judge the validity of the information submitted.

This ruling pertains only to the work relationship addressed in this letter; however, it may be applicable to any other individuals engaged by the firm under similar circumstances. Section 6110(k)(3) of the Code provides it may not be used or cited as precedent.

You are responsible for satisfying the employment tax reporting, filing, and payment obligations that result from this determination, such as filing employment tax returns or adjusting previously filed employment tax returns. The SS-8 Program does not calculate your balance due and send you a bill. Your immediate handling of this correction and your prompt payment of the tax may reduce any related interest and penalties.

For information regarding your tax liabilities, your eligibility for section 3509 rates, and instructions concerning the filing of your employment tax returns, please see the enclosed Information Guide, "Frequently Asked Questions When IRS Reclassifies Workers as Employees." However, if you deem that your firm meets the criteria for section 530 relief as outlined in the enclosure, you do not have to file your employment tax return to reflect this determination. Also, you may choose to reclassify this class of worker to employee status in accordance with this determination for future periods without jeopardizing your ability to claim section 530 relief for past periods.

If you need further assistance in filing your employment tax returns due to the reclassification of your worker, please call the IRS help line at 1-800-829-4933. Call 1-866-455-7438 for assistance in preparing or correcting Forms W-2, W-3, 1099, 1096, or other information returns.

Internal Revenue Code section 7436 concerns reclassifications of worker status that occur during IRS examinations. As this determination is not related to an IRS audit, it does not constitute a notice of determination under the provisions of section 7436.

Sincerely,

Shiela O'Brien
Operations Manager

Enclosures:   Section 530 Fact Sheet
Notice of IRS Compliance Expectations
941/944 Information Guide
Forms: 941 and 941c
2005: 940, 1099-MISC, 1096, W-2, and W-3

*To order forms and publications, please call 1-800-TAX-FORM or visit us online at www.irs.gov.

cc: █████████

Letter 3711-A (CG) (Rev. 9-2003)
Catalog Number 36630Q

EXHIBIT

2



EXHIBIT

3



*Embassy of the United States of America*

November 17, 2008

Dear Mr. Mohammed,

I write to you concerning the death of your son Ali, who was killed on
September 16, 2007 at Nisur Square. On behalf of Ambassador Crocker and
the U.S. Embassy, I again wish to express our condolences to you and your
family for your tragic loss.

As a measure of our sympathies, please accept this offer of condolence from
the Embassy. This gesture is not meant as compensation, as no amount of
money could compensate you for the death of your son.

In addition, and as we discussed, acceptance of our voluntary *ex gratia*
payment does not impose any restrictions or obligations on you of any kind
and is without prejudice to any legal action that you might initiate in United
States courts.

Sincerely,

Ambassador Patricia A. Butenis
Deputy Chief of Mission





Headquarters
Multi-National Force – Iraq
APO AE 09348

June 25, 2009

Ms. Fatima Hafidh Abid al-Razaq

Baghdad, Iraq

Dear Mrs. Abid al-Razaq,

I wish to express my profound sorrow for the loss of your son, Ali, during the shooting incident which occurred at Nisur Square on September 16, 2007. Ali's death was tragic and that tragedy was compounded by the loss of so many other innocent lives that day and the injury to so many other innocent victims.

I am aware that you met earlier this month with the prosecutors handling the criminal case against the Blackwater guards charged for the Nisur Square shooting. The prosecutors advised me confidentially about the extraordinary gesture that you made at the conclusion of your meeting with them. Your substantial generosity on behalf of the families of fallen American soldiers has touched me deeply. In the face of your family's own personal tragedy, your act of kindness and compassion for grieving American families is truly remarkable.

On behalf of the United States Military, please accept my deepest thanks for your generosity.

Sincerely,

Raymond T. Odierno
General, US Army
Commanding



L.1a

EXHIBIT

5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on November 15, 2007

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. **CR - 08 - 360** |
| v. | GRAND JURY ORIGINAL |
| | VIOLATIONS: |
| PAUL ALVIN SLOUGH, | 18 U.S.C. §§ 3261(a)(1); 1112 |
| NICHOLAS ABRAM SLATTEN, | (Voluntary Manslaughter) (Counts One through Fourteen) |
| EVAN SHAWN LIBERTY, | 18 U.S.C. §§ 3261(a)(1); 1113 |
| DUSTIN LAURENT HEARD, | (Attempt to Commit Manslaughter) (Counts Fifteen through Thirty-Four) |
| DONALD WAYNE BALL, | |
| Defendants. | 18 U.S.C. §§ 3261(a)(1); 924(c) (Using and Discharging a Firearm During and in Relation to a Crime of Violence) (Count Thirty-Five) |

URBINA, J. RMU

B

18 U.S.C. § 2
(Aiding and Abetting and Causing
an Act to be Done)

## INDICTMENT

FILED IN OPEN COURT

DEC 0 4 2008

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

The Grand Jury charges that:

### COUNTS ONE THROUGH FOURTEEN
### (Voluntary Manslaughter)

At all times relevant to this Indictment:

1.    On or about September 16, 2007, defendants PAUL ALVIN SLOUGH, NICHOLAS

ABRAM SLATTEN, EVAN SHAWN LIBERTY, DUSTIN LAURENT HEARD, and DONALD WAYNE BALL, were employed by the Armed Forces outside the United States, as defined in 18 U.S.C. § 3267(1), that is:

a. The defendants were employees and subcontractors of Blackwater Worldwide, a company contracting with the United States Department of State, who were employed to provide personal security services in the Republic of Iraq, which employment related to supporting the mission of the United States Department of Defense in the Republic of Iraq.

b. The defendants were present and residing outside the United States in connection with their employment with Blackwater Worldwide.

c. The defendants were not nationals of nor ordinarily residents in the Republic of Iraq.

2. The conduct alleged in this Indictment occurred in and around the Nisur Square traffic circle in the city of Baghdad, in the Republic of Iraq.

3. The conduct alleged in this Indictment constitutes offenses each of which would be punishable by imprisonment for more than one year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States.

4. The conduct alleged in this Indictment occurred outside of the jurisdiction of any particular State or district and within the venue of the United States District Court for the District of Columbia, as provided by 18 U.S.C. § 3238.

5. On or about September 16, 2007, in the city of Baghdad, in the Republic of Iraq, defendants PAUL ALVIN SLOUGH, NICHOLAS ABRAM SLATTEN, EVAN SHAWN LIBERTY, DUSTIN LAURENT HEARD, DONALD WAYNE BALL, and another joint offender

-2-

known to the Grand Jury, unlawfully and intentionally, upon a sudden quarrel and heat of passion, did commit voluntary manslaughter, as defined by 18 U.S.C. § 1112, by killing the following individuals:

| | |
|---|---|
| **COUNT ONE:** | Ahmed Haithem Ahmed Al Rubia'y |
| **COUNT TWO:** | Mahassin Mohssen Kadhum Al-Khazali |
| **COUNT THREE:** | Osama Fadhil Abbas |
| **COUNT FOUR:** | Ali Mohammed Hafedh Abdul Razzaq |
| **COUNT FIVE:** | Mohamed Abbas Mahmoud |
| **COUNT SIX:** | Qasim Mohamed Abbas Mahmoud |
| **COUNT SEVEN:** | Sa'adi Ali Abbas Alkarkh |
| **COUNT EIGHT:** | Mushtaq Karim Abd Al-Razzaq |
| **COUNT NINE:** | Ghaniyah Hassan Ali |
| **COUNT TEN:** | Ibrahim Abid Ayash |
| **COUNT ELEVEN:** | Hamoud Sa'eed Abttan |
| **COUNT TWELVE:** | Uday Ismail Ibrahiem |
| **COUNT THIRTEEN:** | Mahdi Sahib Nasir |
| **COUNT FOURTEEN:** | Ali Khalil Abdul Hussein |

(**Voluntary Manslaughter** and **Aiding and Abetting and Causing an Act to be Done,** in violation of Title 18, United States Code, Sections 3261(a)(1), 1112 and 2.)

## COUNTS FIFTEEN THROUGH THIRTY-FOUR
### (Attempt to Commit Manslaughter)

6.   The Grand Jury realleges and incorporates by reference as if fully stated herein

-3-

paragraphs 1 through 4 of Counts One through Fourteen of this Indictment.

7.    On or about September 16, 2007, in the city of Baghdad, in the Republic of Iraq, defendants PAUL ALVIN SLOUGH, NICHOLAS ABRAM SLATTEN, EVAN SHAWN LIBERTY, DUSTIN LAURENT HEARD, DONALD WAYNE BALL, and another joint offender known to the Grand Jury, unlawfully and intentionally, upon a sudden quarrel and heat of passion, did attempt to commit manslaughter attempting to kill the following individuals, who were wounded as a result therefrom:

| | |
|---|---|
| COUNT FIFTEEN: | Majed Salman Abdel Kareem Al-Gharbawi |
| COUNT SIXTEEN: | Jennan Hafidh Abid al-Razzaq |
| COUNT SEVENTEEN: | Yasmin Abdul Kidr Salhe |
| COUNT EIGHTEEN: | Mohanad Wadhnah |
| COUNT NINETEEN: | Haydar Ahmad Rabie Hussain Al-Khafaji |
| COUNT TWENTY: | Hassan Jaber Salman |
| COUNT TWENTY-ONE: | Farid Walid Hasoun Al-Kasab |
| COUNT TWENTY-TWO: | Abdul Amir Raheem Jihan Yasser |
| COUNT TWENTY-THREE: | Wisam Raheem Fliah Hasan Al-Miri |
| COUNT TWENTY-FOUR: | Talib Mutluk Diwan |
| COUNT TWENTY-FIVE: | Adel Jaber Sham'ma Al-Jadiri |
| COUNT TWENTY-SIX: | Nasir Hamzah Latif Al-Rikabi |
| COUNT TWENTY-SEVEN: | Mahdi Abid Khider Abbas Al-Faraji |
| COUNT TWENTY-EIGHT: | Abdul Wahab Abdul Qadar Al-Qalamchi |
| COUNT TWENTY-NINE: | Bara Sadoon Ismail Al-Ani |

-4-

| COUNT THIRTY: | Sami Hawa Hamud Al-Sabahin |
|---|---|
| COUNT THIRTY-ONE: | Fawziyyah Aliwi Hassoon |
| COUNT THIRTY-TWO: | Ali Hadi Naji Al-Rubaie |
| COUNT THIRTY-THREE: | Alah Majeed Sghair Zaidi |
| COUNT THIRTY-FOUR: | Jassim Mohammad Hashim |

(Attempt to Commit Manslaughter and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Sections 3261(a)(1), 1113 and 2.)

## COUNT THIRTY-FIVE
### (Using and Discharging a Firearm During and In Relation to a Crime of Violence)

8.     The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs 1 through 4 of Counts One through Fourteen of this Indictment.

9.     On or about September 16, 2007, in the city of Baghdad, in the Republic of Iraq, defendants PAUL ALVIN SLOUGH, NICHOLAS ABRAM SLATTEN, EVAN SHAWN LIBERTY, DUSTIN LAURENT HEARD, and DONALD WAYNE BALL, and another joint offender known to the Grand Jury, knowingly used and discharged firearms, that is, an SR-25 sniper rifle; machine guns (M-4 assault rifles and M-240 machine guns); and destructive devices (M-203 grenade launchers and grenades), during and in relation to a crime of violence for which each of them may be prosecuted in a court of the United States, that is, in connection with the crime of voluntary manslaughter, as alleged in Counts One through Fourteen of this Indictment, and the crime

-5-

of attempt to commit manslaughter, as alleged in Counts Fifteen through Thirty-Four of this Indictment.

(**Using and Discharging a Firearm During and in Relation to a Crime of Violence and Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Sections 3261(a)(1), 924(c) and 2.)

A TRUE BILL:

Brian Lynch

FOREPERSON

Jeffrey A. Taylor / BM

Attorney of the United States in and for the District of Columbia

United States District Court
For the District of Columbia
A TRUE COPY
NANCY MAYER WHITTINGTON, Clerk
By_____

-6-

EXHIBIT

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SE...L

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. CR-08-34? |
| | ) | |
| JEREMY P. RIDGEWAY, | ) | **FILED** |
| Defendant. | ) | NOV 18 2008 |
| | ) | Clerk, U.S. District and Bankruptcy Courts |

## FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

The defendant Jeremy P. Ridgeway and the United States agree that the following facts are true and correct, and that if this matter were to proceed to trial the United States would prove these facts beyond a reasonable doubt:

1.    Throughout September 2007, defendant Ridgeway worked as an independent contractor and employee of Blackwater Worldwide, a contractor of the Department of State (DOS), to provide personal security services for DOS diplomats and other United States Government personnel in the city of Baghdad, in the Republic of Iraq. Defendant Ridgeway's employment as a Blackwater contractor related to supporting the mission of the Department of Defense in Iraq.

2.    The events described herein took place at the Nisur Square traffic circle in Baghdad, Iraq, on land that was commonly used for the purposes of United States diplomatic, consular, military and other United States Government missions and entities in Baghdad. Nisur Square is located just outside a fortified area of central Baghdad known as the "International Zone" (also commonly known as the "Green Zone"), where most, if not all, of the foreign embassies in Iraq are located, including the United States Embassy.

3.     On September 16, 2007, defendant Ridgeway and eighteen other Blackwater independent contractors were assigned to a convoy of four heavily-armored trucks known as a Tactical Support Team, using the call sign "Raven 23," whose function was to provide back-up fire support for other Blackwater personal security details operating in the city of Baghdad.  Defendant Ridgeway was assigned to a turret gunner position on the last truck of the Raven 23 convoy, and he was armed with an M-4 assault rifle, an M-240 machine gun, and a 9-mm Glock pistol.

4.     The government's evidence would prove that on September 16, 2007, at least six members of the Raven 23 convoy, including defendant Ridgeway, opened fire with automatic weapons and grenade launchers on unarmed civilians located in and around Nisur Square in central Baghdad, killing at least fourteen people, wounding at least twenty people, and assaulting but not injuring at least eighteen others.  None of these victims was an insurgent, and many were shot while inside of civilian vehicles that were attempting to flee from the Raven 23 convoy.  One victim was shot in his chest, while standing in the street with his hands up.  At least eighteen civilian vehicles were damaged, some substantially, by gunfire from the Raven 23 convoy.

5.     On September 16, 2007, at around noon, the Raven 23 convoy was responding to the detonation of a vehicle-borne improvised explosive device (VBIED) that had been just exploded in the vicinity of a different Blackwater personal security detail located about a mile away from Nisur Square, and which was transporting a State Department protectee.  Defendant Ridgeway and the other members of the Raven 23 convoy understood that their mission was defensive in nature, and that they were not permitted to engage in offensive military actions, use the military tactic known as "suppressive fire," or exercise police powers.  Defendant Ridgeway and the other members of the Raven 23 convoy understood that they were only authorized to discharge their firearms in self-defense and as a last resort.

6.    As a condition of their employment as State Department contractors, defendant Ridgeway and the other members of the Raven 23 convoy each signed a written acknowledgment form, agreeing to abide by the use-of-force policies set forth in the State Department Mission Firearms Policy for Iraq. The Mission Firearms Policy provided:

> The touchstone of the Embassy Baghdad policy regarding the use of deadly force is **necessity**. The use of deadly force must be objectively reasonable under all the circumstances known to the individual at the time . . . The necessity to use deadly force arises when all other available means of preventing imminent and grave danger to a specific individual or other person have failed or would be likely to fail. Thus, employing deadly force is permissible when there is no safe alternative to using such force and without the use of deadly force, the individual or others would face imminent and grave danger.

Mission Firearms Policy, United States Embassy, Baghdad, Iraq, at 4 (emphasis in original). The Mission Firearms Policy also recognizes that the reasonableness of a belief or decision must be viewed from the perspective of the individual on the scene, who may often be forced to make split second decisions.

7.    The government's evidence would prove that the Raven 23 convoy had not been authorized to depart from the International Zone on September 16, 2007. Shortly after having done so, the Raven 23 convoy had been specifically ordered by the Regional Security Office at the United States Embassy to return to the International Zone as soon as possible. In contravention of that order, the Raven 23 convoy, under the command of its shift leader, proceeded to set up a blockade at Nisur Square to stop civilian traffic from flowing through the traffic circle.

8.    The government's evidence would prove that the four heavily-armored vehicles in the Raven 23 convoy entered Nisur Square from the east side of the circle – traveling against the flow of traffic – and then positioned themselves in a line on the southern half of the circle, in order to block any traffic from entering the circle from the south or west. Seconds after the Raven 23

convoy entered the traffic circle, the Blackwater independent contractors from the third vehicle opened fire on a white Kia sedan that had been approaching the traffic circle from the south. Those initial shots killed the driver of the vehicle, who was later identified as a second-year medical student named Ahmed Haithem Ahmed Al Rubia'y.

9.     Defendant Ridgeway heard the initial shots coming from the Blackwater truck in front of him, and then observed one of his teammates firing a machine gun into the front driver's side windshield of the white Kia sedan. Defendant Ridgeway noticed that the white Kia sedan was also occupied by a front passenger, whom defendant Ridgeway could not clearly see, but who appeared to be moving his or her arms. Defendant Ridgeway also saw an individual standing on the street in close proximity to the white Kia sedan. Defendant Ridgeway then fired multiple rounds from his M-4 assault rifle into the front passenger's side windshield of the white sedan, killing the passenger. At the time he fired those rounds into the white Kia sedan, defendant Ridgeway intended to kill the passenger of that vehicle, who was later identified as Dr. Al-Khazali, the mother of the driver, Mr. Al Rubia'y. The individual standing on the street in close proximity to the white Kia sedan was later identified as an Iraqi traffic police officer, who had responded to the initial shooting at that vehicle.

10.     In addition to defendant Ridgeway, several other members of the Raven 23 convoy fired their weapons into the white Kia sedan. At least one member of the convoy also launched an M-203 grenade at the white Kia sedan, which exploded under the passenger compartment of the vehicle, rupturing and igniting the fuel lines and causing the vehicle to erupt in flames. A high volume of rounds were fired into the front grille, hood, and windshield of the white Kia sedan.

11.     Given that the first shots were fired at the white Kia sedan seconds after the Raven 23 convoy had arrived in the traffic circle, defendant Ridgeway recognized that there had been no attempt to provide reasonable warnings to the driver of that vehicle to come to a complete stop prior

to the use of deadly force by members of the Raven 23 convoy. As provided in the Mission Firearms Policy, reasonable warnings would have included the (1) use of hand and verbal warnings, (2) firing of pen flares, (3) pointing of weapons at the vehicle, and/or (4) firing of rounds into the engine block.

12.     Minutes later, as the Raven 23 convoy departed from Nisur Square and proceeded against the flow of traffic to the north of the circle, turret gunners in the convoy continued to fire their machine guns at civilian vehicles that posed no threat to the convoy. Defendant Ridgeway fired at least three rounds from his M-4 assault rifle into the roof of a white Chevrolet Celebrity sedan that was next to the convoy, and wounded the driver of the white Chevrolet Celebrity, who was later identified as Abdul Wahab Abdul Qadar Al-Qalamchi. Shots from defendant Ridgeway's assault rifle struck Mr. Al-Qalamchi in the right shoulder and arm, causing permanent and life-threatening injury, including obvious, permanent disfigurement to Mr. Al-Qalamchi. Bullet fragments also penetrated Mr. Al-Qalamchi's leg. At the time he fired those rounds into the white Chevrolet Celebrity, defendant Ridgeway intended to kill the driver of that vehicle.

13.     When defendant Ridgeway fired his assault rifle into the white Kia sedan and the white Chevrolet Celebrity, he acted knowingly, unlawfully, purposefully, and not by accident, inadvertence, or mistake, or with any legal excuse or justification. Defendant Ridgeway's use of deadly force in both instances was not objectively reasonable under all of the circumstances as they appeared to him at the time.

14.     With respect to the white Kia sedan, defendant Ridgeway understood that the first shots were fired by his teammate seconds after the Raven 23 convoy had arrived in the traffic circle, the white sedan was moving slowly at the time that defendant Ridgeway fired at that vehicle, and one individual was standing in close proximity to the sedan at that time. A reasonable person in defendant Ridgeway's situation would have recognized that there were other safe alternatives to the

use of deadly force against the passenger of the white Kia sedan. Moreover, a reasonable person in defendant Ridgeway's situation would have recognized that the white Kia sedan did not exhibit any indicia of a VBIED attacker as provided in the Mission Firearms Policy. The vehicle was moving slowly and had more than one occupant. The vehicle was not "riding heavy" or "lop-sided." The vehicle was not occupied by a single driver "wearing a bandana," who appeared to be "fixated on the motorcade," or who appeared to be "talking to him/herself."

15.    Similarly, with respect to the white Chevrolet Celebrity, defendant Ridgeway fired his shots into the roof of that vehicle as the Raven 23 convoy was approaching that vehicle from behind, and before defendant Ridgeway saw any occupant of that vehicle. A reasonable person in defendant Ridgeway's situation would have assessed whether the white Chevrolet Celebrity, including any occupant of that vehicle, posed any threat before using deadly force against the driver of that vehicle.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia
D.C. Bar No. 498610

By:

Kenneth C. Kohl
D.C. Bar No. 476236
Assistant United States Attorney
National Security Section
(202) 616-2139
Ken.Kohl@usdoj.gov

Jonathan M. Malis
D.C. Bar No. 454548
Assistant United States Attorney
National Security Section
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

Dated: November 18, 2008

## Defendant's Stipulation and Signature

After consulting with my attorney, William Sullivan, and pursuant to the plea agreement entered into between me, Jeremy P. Ridgeway, and the United States, I hereby stipulate and agree that the above Factual Proffer in Support of Guilty Plea is true and accurate, and that had this matter proceeded to trial, the United States would have proved beyond a reasonable doubt the facts stated in the Proffer.

_18 Nov 2008_
Date

_____
Jeremy P. Ridgeway
Defendant

## Attorney's Acknowledgment

I am Jeremy P. Ridgeway's attorney. I have carefully reviewed the above Factual Proffer in Support of Guilty Plea with him. To my knowledge, his decision to stipulate and agree to these facts is an informed and voluntary one.

_11/18/08_
Date

_____
William Sullivan, Esq.
Counsel for defendant Jeremy P. Ridgeway